**ERVING PAPER MILLS, a Massachusetts corporation, Plaintiff,**

v.

**HUDSON–SHARP MACHINE CO., a Wisconsin corporation, Defendant.**

No. 59–C–18.

United States District Court
E. D. Wisconsin.

Sept. 26, 1963.

On Motion for New Trial Dec. 9, 1963.

was defendants' position that no formal action was required.

E. L. Everson, James L. Everson and John C. Whitney, Green Bay, Wis., for plaintiff.

**916**

James C. Mallien, William K. McKibbage and Laurence C. Hammond, Jr., Milwaukee, Wis., for defendant.

GRUBB, District Judge.

This is an action for damages for breach of contract to manufacture and deliver two wrapping machines. The issue of damages has been severed from the issue of liability by stipulation of the parties.

Plaintiff, Erving Paper Mills (hereinafter referred to as "Erving"), is a Massachusetts corporation engaged, among other things, in the manufacture and sale of paper napkins. Defendant, Hudson-Sharp Machine Company (hereinafter referred to as "Hudson-Sharp"), is a Wisconsin corporation engaged in the manufacture and sale of various types of machinery. The court has jurisdiction because of diversity of citizenship.

Defendant raises the following defenses:

1. Defendant did not accept plaintiff's offer but only acknowledged it.

2. Plaintiff's offer was subject to a condition precedent, and therefore even if accepted, it placed no duty upon the defendant, since the condition never occurred.

3. The alleged contract is too indefinite to be enforced and fails to comply with the statute of frauds.

### I.
### WAS PLAINTIFF'S OFFER ACCEPTED TO CREATE A CONTRACT?

■ The majority rule is that a mere acknowledgment of an offer does not constitute an acceptance of such an offer. 46 Am.Jur., Sales § 48 (1943). This is qualified to the extent that an "acknowledgment" of the receipt of an order, together with other circumstances, may be evidence from which acceptance may be properly inferred. 1 Williston, Contracts § 72 (3rd ed. 1957). In the present case Hudson-Sharp's purported acknowledgment reads as follows:

"We have for acknowledgment your P.O #11319 dated August 20, 1956, covering two No. 2W10 Campbell Wrappers especially constructed for wrapping 160 and 250 count luncheon napkins in polyethylene, per samples submitted.

"It is understood that these machines will be constructed on the basis as set out in your order, with one machine to be manufactured and installed first before building the second machine.

"Thank you very much for the order, and we have entered these in our production schedule accordingly." (Exhibit 12)

■ The language takes the letter beyond a mere acknowledgment of the order, thereby creating the other circumstances needed to constitute it an acceptance. After initially acknowledging the order, defendant promises to build the machines according to the terms of the offer when it says: "It is *understood* that these machines *will be* constructed on the basis as set out in your order, * * *." (Emphasis added.)

The defendant further reports: " * * we *have* entered these in our production schedule accordingly." (Emphasis added.) This goes beyond a mere promise of giving prompt attention to the matter which courts have generally held is not enough to constitute an acceptance. The past tense is used in stating what the defendant has done, rather than providing a vague promise to do something at some future indefinite date. The promise to build the machines is implicit from the entire tone of the letter. Particularly in point is the Wisconsin case of Felt & Tarrant Manufacturing Co. v. Northwestern Egg & Poultry Co., 178 Wis. 552, 190 N.W. 431 (1922).

■ Subsequent conduct of the parties indicating that each party recognized the existence of a contract may also be considered. United States v. Sylvanus, 192 F.2d 96 (7th Cir., 1951). The testimony of Cletus A. Wetli, vice-president and sales manager of Hudson-Sharp in 1956, states that a firm order and respective acceptance was intended. (Tr. p.

167) A subsequent letter of S. J. Campbell, president of Hudson-Sharp at the time of the offer and purported acceptance, evidences that it was his intention to accept the order and that it was binding. (Tr. pp. 222–226) The successor management also conceded this point as shown by A. J. Olsen, the general manager of Hudson-Sharp, when he stated in a letter to Erving: "We fully realize that the order was originally accepted, * *." (Exhibit 17)

The entire record clearly indicates that both parties considered the order to have been accepted. It was not until October 1956 that defendant first indicated that it had no intention to build the machines. Even then Hudson-Sharp sought to have Erving agree to cancel the order as opposed to asserting that no contract obligation existed in the first instance. (Exhibits 17, 19, 21) The language used in the purported acceptance letter plus the subsequent pronouncements and acts of the parties indicate that this letter of acknowledgment was in fact an acceptance of plaintiff's order and was intended as a memorandum of such acceptance.

Defendant further contends that there were three variances in defendant's "acknowledgment" letter which preclude the possibility of a binding contract. It is elementary contract law that the acceptance of an offer upon terms varying from those of the offer is a rejection of the offer. See Leuchtenberg v. Hoeschler, 271 Wis. 151, 154, 72 N.W.2d 758 (1955); Hess v. Holt Lumber Company, 175 Wis. 451, 455, 185 N.W. 522 (1921).

The alleged "variances" contained in defendant's letter of August 27, 1956, are:

1. That the two machines were to be "especially constructed";

2. That the machines would wrap napkins in polyethylene "per samples submitted"; and

3. That "one machine to be manufactured and installed first before building the second machine." (Exhibit 12)

With regard to the first alleged variance, defendant does not indicate how this language in any way qualifies or varies the terms of the purchase order. The court finds that the words "especially constructed" merely confirm the undisputed fact that the machines were to be so constructed as to meet the particular specifications stated in the purchase order.

The second alleged variance—that the machines would wrap napkins in polyethylene "per samples submitted"—again is merely a reference to the terms of the purchase order which specified that each machine was to wrap napkins "as samples to be submitted by Hudson Sharp and to be approved by Erving Paper Mills." (Exhibit 10)

The third alleged variance—"one machine to be manufactured and installed first before building the second machine" —is equally without merit. This statement does not vary the requirement of the purchase order that " * * * the manufacture of the second machine is to be held up until the first machine is in satisfactory operation at Erving Paper Mills and a decision is reached as to what product is then to be wrapped on this second machine." (Exhibit 11)

II.

WAS PLAINTIFF'S OFFER SUBJECT TO A CONDITION PRECEDENT, AND IF SO, WAS DEFENDANT RELIEVED BECAUSE THE CONDITION DID NOT OCCUR?

The order in question contains the following language:

"Each wrapper to efficiently polyethylene wrap ¼ fold, 13½", luncheon napkins, both 160 ct. & 250 ct. package sizes as samples to be submitted by Hudson Sharp and to be approved by Erving Paper Mills." (Exhibit 11)

Prior to the order being sent to Hudson-Sharp, both parties had exchanged certain samples. The record is not entirely clear as to whether Hudson-Sharp submitted any samples to Erving after August 20, 1956, the date of the purchase order. Defendant now contends

that the words "as samples to be submitted by Hudson Sharp and to be approved by Erving Paper Mills" created a condition precedent to a contractual obligation.

■ Where it is doubtful whether words create a promise or an express condition, they are interpreted as creating a promise. Restatement, Contracts § 261 (1932). A condition in a promise limits the undertaking of the promisor to perform, either by confining the undertaking to the case where the condition happens or to the case where it does not happen. Here we have two events mentioned—the supplying of samples and their approval. Defendant would have the court find that both elements were conditions to contractual liability. This would be difficult to find. Whether a provision in a contract is a condition, the nonfulfillment of which excuses performance, depends upon the intent of the parties to be ascertained from a fair and reasonable construction of the language used in light of all the surrounding circumstances. Restatement, Contracts § 250 (1932); Lach v. Cahill, 138 Conn. 418, 85 A.2d 481 (1951). Here Erving went to elaborate pains to draft a written memorandum evidencing most of the agreement. Further, any condition which might have been inserted is assumed to be for the benefit of Erving, since it would have been more advantageous for Hudson-Sharp to have received an absolute promise. Considering the facts in this light, it is not reasonable to read the phrase "as samples to be submitted by Hudson Sharp" as creating a condition to contractual liability on the part of Hudson-Sharp. Hudson-Sharp has not alleged that it ever insisted on such a provision; yet, if it were construed as a condition, it would run entirely in Hudson-Sharp's favor and offer no benefit to Erving. Defendant alone would then have controlled whether the condition occurred in the first instance. Erving would have gained nothing from such an arrangement. A much more reasonable construction is that in accepting the offer, Hudson-Sharp implicitly promised to supply samples to Erving for its approval and incurred an immediate obligation to proceed to do so.

■ Was Erving's approval of samples a condition precedent of any sort? A reasonable reading of the language used in light of the background surrounding the negotiations indicates that a condition was intended. Erving was concerned with securing a tightly-wrapped package. Submitted samples had not been entirely satisfactory. (Exhibits 1, 3–A, 14, 25) In entering into a contract for the purchase of such machines, it was therefore natural that Erving would desire to provide some safeguard before it incurred an absolute obligation to receive and pay for the machines.

■ What the parties did here does not necessarily constitute a condition precedent to the existence of the contract itself as the defendant contends. The parties, both before and after the offer and acceptance, acted as if they had entered into a binding contract. Although it appears a condition was inserted, this was more logically a condition to the duty of an immediate obligation on Erving's part. It was not a condition to the existence of a contract itself. This is the compelling conclusion if a consistent interpretation is to be followed. A condition precedent may be either a condition to the existence of a contract or to an immediate obligation under a contract. 5 Williston, Contracts § 666 (3rd ed. 1961). Here it must be the latter since obviously Erving intended to bind Hudson-Sharp to design such a machine and to submit samples.

Erving was relying heavily on the receipt of said machines. (Exhibit 14) Having placed reliance upon the fact that they would receive the machines, it was not about to leave the entire matter in the hands of Hudson-Sharp. Again, the determinative factor in this conclusion is the fact that such a condition is generally inserted for the benefit of the promisor and not the promisee.

This court having determined that there was a condition to Erving's duties under the contract, the question now is

whether the condition did in fact occur. A companion question is whether Hudson-Sharp submitted samples for approval to Erving as it had promised to do. The evidence provides a certain conflict. Cletus A. Wetli, Hudson-Sharp's sales manager, testified as follows in his deposition which appears at pages 300–301 of the trial transcript:

"A  The original samples at the time the order was placed. They were satisfactory with the exception they would like them a little tighter which prompted me writing again after discussion with Green Bay that we could get them tighter. I would send them some more samples with a tighter wrap.

"Q  In other words, if I correctly understand your testimony, the expression of satisfaction with the rigidity of the sample was actually expressed to you at the time that the order was signed on August 20, 1956?

"A  Yes.

"Q  That was coupled with a request that if it was Possible (sic) to do so, they would likely get them a little tighter?

"A  Yes.

\*    \*    \*    \*    \*    \*

"Q  Do you know whether or not Erving ever expressed satisfaction with those later samples?

"A  Not that I could actually pinpoint it but they certainly were all right or I would have heard about it."

The above testimony clearly indicates that samples were sent to Erving subsequent to the giving of the purchase offer. However, contrary to this testimony is that of Erving's own officials. Clement A. Durna, plaintiff's production manager, testified that Erving received samples from Hudson-Sharp on only two occasions—around July 17, 1956 (Tr. pp. 18–27), and around August 10, 1956 (Tr. pp. 30–33, 66). This was substantially the testimony of Morris Housen, chairman of the board of directors at Erving, since he stated that two sets of samples were both received prior to the time of the placement of the purchase order. (Tr. pp. 135–136)  The correspondence received in evidence substantiates that two sets of samples were exchanged prior to August 20, 1956, the date of the purchase order. (Exhibits 1, 20)  There is no evidence that more than two sets of samples were ever sent by Hudson-Sharp to Erving.  Even Mr. Wetli's testimony only speaks of two separate sets of samples having been sent by Hudson-Sharp to Erving.  The overwhelming weight of evidence is that no samples were sent to Erving after the purchase order was given and accepted.  This fact alone does not necessarily benefit the defendant as it seems to believe.  It only proves that Hudson-Sharp either failed to perform its promise to submit samples for approval and thus breached the contract in this manner, or that the plaintiff, either by its actions or silence, or both, waived the condition that they be submitted.

Since the condition was plainly for Erving's benefit, it was free to waive the condition.  Stewart v. Griffith, 217 U.S. 323, 30 S.Ct. 528, 54 L.Ed. 782 (1910); Insurance Co. v. Norton, 96 U.S. 234, 24 L.Ed. 689 (1877).  Erving at no time demanded samples after the purchase order evidencing the contract was given.  It did seek to see the machine sometime before delivery.  But this fact does not indicate that it was thereby demanding performance of the condition. It would be perfectly consistent to waive the condition and still insist on examining the machine before delivery, since defendant still had an obligation to build the machines according to the contract. The record clearly indicates that the plaintiff believed the defendant was working on the machines and would make delivery at the designated time.  Plaintiff made it clear that it expected delivery.  It would be reasonable to conclude that if samples were expected by Erving, some demand would have been made for their submission before the passage of any lengthy period and well

before the anticipated delivery date. This follows, since the condition was designed to protect Erving. Instead, no samples were demanded, and both parties continued as if the requirement had been met or dropped. The following circumstances all evidence that the parties believed that they had proceeded beyond the point of exchanging samples:

1. Erving sent Hudson-Sharp labels and napkins to be used in experimenting with the machine. These were sent on August 27, 1956. No demand for samples was made up to this time. The sending of such materials tends to evidence that Erving felt that the requirement had been met or was no longer necessary. (Dep. Exhibits 29, 30)

2. Memorandum of September 4, 1956, regarding receipt of samples of napkins from Erving and the above referred to labels with instructions that they should be held until the machine was ready. This again inferred that Erving was telling Hudson-Sharp to go ahead and build the machine. (Dep. Exhibit 31)

3. Request to Erving for electrical current requirements (Exhibit 5) on September 7, 1956, and Erving in turn supplying such information on September 20, 1956 (Exhibit 6).

4. Erving's request on October 12, 1956, to see the machine before shipment. (Exhibit 13)

5. Hudson-Sharp's first indication to Erving on October 17, 1956, that it would not make delivery because it felt that it could not build the desired machine. Nothing was said then or subsequently that the contract failed because samples had not been submitted or approved. In fact, the argument was raised for the first time in defendant's post-trial brief.

At no time after August 20, 1956, was anything said by either party as to the necessity of further samples being submitted by Hudson-Sharp and

approved. The inescapable conclusion is that either Erving was satisfied with what it had received as of the time of the offer, as Mr. Wetli testified (Tr. pp. 291–301), or it was content to rely on Hudson-Sharp to deliver a machine which it had promised would meet the specifications of the contract. The condition being designed to protect Erving, the court finds that it was either satisfied or waived.

## III.

## THE ALLEGED CONTRACT IS TOO INDEFINITE TO BE ENFORCED AND FAILS TO COMPLY WITH THE STATUTE OF FRAUDS

Section 121.04 of the Wisconsin Statutes provides in part as follows:

"(1) A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually received the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf.

"(2) The provisions of this section apply to every such contract or sale, notwithstanding that the goods may be intended to be delivered at some future time or may not at the time of such contract or sale be actually made, procured or provided, or fit or ready for delivery, or some act may be requisite for the making or completing thereof, or rendering the same fit for delivery; but if the goods are to be manufactured by the seller especially for the buyer, and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section shall not apply."

Since the statute of frauds has been pleaded as an affirmative defense

the first question is: Upon whom does the burden rest to establish that the contract complied with or is an exception to the statute? While there appears to be a conflict in authority, the general rule is that where the statute of frauds is raised against a contract, the party seeking enforcement of the contract has the burden of proving compliance with the statute or of showing facts taking the case out of the statute. Shepherd v. Clements, 25 Ala.App. 7, 141 So. 250 (1931), reversed on other grounds 224 Ala. 1, 141 So. 255 (1931); Beaver v. Raytheon Mfg. Co., 299 Mass. 218, 12 N. E.2d 807 (1938); Frost v. Kendall, 320 Mass. 623, 70 N.E.2d 521 (1947). See also 37 C.J.S. Frauds, Statute of § 279, p. 805. This is the rule in Wisconsin. Bacon v. Eccles, Jr., 43 Wis. 227 (1877); Libman v. Fox-Pioneer Scrap Iron Company, 175 Wis. 485, 185 N.W. 551 (1921).

The question then is whether or not plaintiff sustained this burden and established that the machines in question qualify as goods "to be manufactured by the seller especially for the buyer, and are not suitable for sale to others" in the ordinary course of the defendant's business. If they do, the statute of frauds obviously has no application.

Were the machines to be specially manufactured? The evidence discloses the following:

1. Erving appeared to be one of the first manufacturers of paper napkins to package said product in a reusable polyethylene bag. (Tr. p. 9)

2. Testimony of Cletus A. Wetli (Tr. pp. 286–289):

"Q  Did Erving want a standard 2W10 wrapper?

"A  I can answer that, only I have to explain to you what is standard. 2W6, 2W8, 2W10 refer to the size, to the width of the machine and about 75 per cent of the working of that machine is standard. The other 25 per cent, it varies anywheres from 50 per cent down to 10 per cent, would be changed to satisfy the particular product we are going to wrap.

"Q  In other words, if Hudson-Sharp upon receiving Exhibit 2, which is the original purchase order, had just gone over in the back room and taken out a 2W10 wrapper and shipped it to Erving, that would not have fulfilled what Erving asked for?

*    *    *    *    *    *

"A  No, because the machine out of the back room, a 2W10, would not be completed. A standard machine would consist of the frames, differential, the motor, and a few things that would be standard. That 2W10 machine would be taken from the back room as a base and to which special features required for a particular product would be added.

"Q  In your memo which accompanied Exhibit 2—* * *. You stated, 'You have received samples of their requirements.' Does this mean that Hudson-Sharp had samples of what Erving required?

"A  Yes, samples of their napkins wrapped any way they wanted them wrapped.

*    *    *    *    *    *

"Q  You would take the napkins, put them on the machine and submit them to Erving?

*    *    *    *    *    *

"A  We can't put them on the machine. The machine isn't built. We take the sample that they sent us.

"Q  Yes.

"A  Then by hand make up a sample in a manner that would be accomplished on the machine. After the machine is finished, we make a package like the sample we submitted. * * *"

3. The machine was to contain Erving's electrical current requirements.

4. In excusing their planned nonperformance, defendant claimed that " * * our Engineering Department has not been able to *design* a machine that we feel will do the job you want." (Emphasis added.) (Exhibit 7)

5. Defendant later claimed: " * * * we feel that the only possibility of *building* a practical machine for this application is to do some development work first." (Emphasis added.) (Exhibit 19)

It is obvious that the defendant did not have a machine which would accomplish the plaintiff's needs. Thus, it fully intended to take an existing machine, use it as a base, and build it into a machine to perform the plaintiff's specialized requirements. The desired machine was not then a standard item which Hudson-Sharp kept in stock. The machine that did exist was ill-suited for the job. Defendant was to take the machine it did have, consisting of a frame, motor, differential, and certain other parts, and build it into a unit which would perform plaintiff's own needs.

■ Would the machines have been suitable for sale to others in the normal course of trade? Prior to the adoption of the Uniform Sales Act in 1911, contracts for work and labor were excluded from the application of the statute of frauds. Under the Sales Act, this exception was continued with at least one additional qualification. Specially made goods are not subject to the requirements of the statute of frauds unless they are not suitable for sale to others in the normal course of trade. Only when the latter requirement is present are such contracts considered contracts for work and labor and, therefore, not a sale of goods. A. A. Store Fixture Mart Co., Inc. v. Seay & Thomas, Inc., 19 Ill.App.2d 574, 154 N.E.2d 848 (1958). The fact that goods will require slight alterations to render them salable does not place the contract within the exception stated in the Sales Act. Saco-Lowell Shops v. Clinton Mills Co., 277 F. 349 (1st Cir.,

1921); Clinton Mills Co. v. Saco-Lowell Shops, 3 F.2d 410 (1st Cir., 1925); Berman Stores Co., Inc. v. Hirsh, 240 N.Y. 209, 148 N.E. 212 (1925). Generally the cases have required proof that substantial changes would be necessary.

The record reveals the following testimony touching on the potential marketability and the amount of alteration which would have been necessary:

1. Erving was aware of no competitor marketing napkins in a polyethylene bag in 1955 and 1956. (Tr. p. 9)

2. The thickness of Erving's napkins was a factor in designing the machine, and the machine was to be built specially as to this specification. (Exhibits 8, 9)

3. The standard machine would have been substantially altered and redesigned to accommodate Erving's needs. (Tr. pp. 299–301)

4. The machine was to contain Erving's electrical requirements. (Exhibits 5, 6)

5. Arthur J. Olsen, Hudson-Sharp's general manager, testified as follows (Tr. p. 328):

"Q If Hudson-Sharp at the time it received Erving's purchase order, or in 1956 had had a machine which would tightly wrap paper napkins in polyethylene, would Hudson-Sharp have found those machines suitable for sale to others in the ordinary course of Hudson-Sharp's business?

"A Yes."

6. Mr. Wetli, in a memorandum to Mr. Olsen dated October 17, 1956, said:

"There is quite a demand for such a type of machine to wrap paper products, such as napkins, toilet paper and other kindred items in polyethylene, * * *." (Exhibit 27)

The record is clear that Hudson-Sharp would have been required to specially build the desired machines. The record is not at all clear that such would not

have been resalable in the ordinary course of trade. Plaintiff's brief appears to assume that if the goods are specially manufactured for one's particular needs that "per se" they are not readily resalable. This does not necessarily follow. The defendant contends in its post-trial rebuttal brief at page 8 that:

"* * * There is nothing in the record in this case to establish that anything more than routine adjustment would be required to permit the Campbell Wrappers contemplated by the second purchase order to be sold by the defendant in the ordinary course of its business."

■ This is not accurate. There is little in the record to indicate that a substantial overhaul would have been necessary to make the machines marketable beyond what might possibly be inferred from the nature of their special construction. Likewise, there is absolutely nothing to indicate that only a "routine" adjustment would have been necessary as alleged by defendant's counsel. In the present case, though undoubtedly the machines were to be manufactured by the defendant especially for the plaintiff, the plaintiff has failed to carry its burden. The evidence does not establish that after manufacture the machines would not have been suitable for sale in the ordinary course of seller's business. It is the court's conclusion that the contract is, therefore, within and subject to the requirements of the statute of frauds.

Since the machines were goods within the meaning of the statute of frauds, did the purchase order (Exhibit 11) and the acceptance letter (Exhibit 12) satisfy the requirements of Section 121.04 of the Wisconsin Statutes, commonly referred to as the statute of frauds?

■ It is obvious that the writings in question were not intended as a complete integration of the agreement reached, since there is specific reference to certain other details agreed to. A determination as to whether the contract is one in writing or whether the documents are a memorandum of a parol contract is important. The parol evidence rule affects a contract in writing, whereas it does not apply to a memorandum in writing. Ellis v. Klaff, 96 Cal.App.2d 471, 216 P.2d 15 (1950). The former is necessarily the only complete statement of the contract and the only evidence in regard to it, since it constitutes an integration of the contract. But a written memorandum may be shown by parol to be inaccurate, incomplete, inadequate and, hence, not a compliance with the statute. Burge v. Krug, 160 Cal.App.2d 201, 325 P.2d 119 (1958); In re Kossack, 113 F.Supp. 884 (S.D. Calif.1953).

Here the memorandum does not constitute a contract in writing. Erving placed an order with Hudson-Sharp on August 20, 1956. This order was a result of prior negotiations between the parties. Subsequent to the giving of this order, Messrs. Housen and Campbell got together or conferred by telephone and reached an agreement which constituted the contract. The parties then set about to prepare a written memorandum of this agreement. Erving redrafted the purchase order, using the identical language of the prior order but for a reduction in price and a slight grammatical change. Defendant subsequently sent a letter acknowledging and accepting the order. There is specific reference to other agreed-upon details. From the face of the two documents, it is obvious that they do not purport to represent a complete integration of their agreement but only intend the writings to evidence it.

■ Wisconsin's statute of frauds only requires a written memorandum of the contract, but such a memorandum must be complete in itself, and it cannot be eked out by parol evidence. North American Seed Co. v. Cedarburg Supply Co., 247 Wis. 31, 18 N.W.2d 466, 159 A. L.R. 250 (1945). This requirement has been qualified to the extent that courts only require the "essential" or "material" elements or terms of the oral contract to be evidenced by the memorandum. Remington Rand Business Serv-

ice, Inc. v. Walter J. Peterson Co., 58 F.2d 11 (6th Cir., 1932); Brownell v. Suehiro, 206 F.2d 892 (9th Cir., 1953). In the case of Zimmerman Brothers & Company v. First National Bank of Stevens Point, 219 Wis. 427, 263 N.W. 361 (1935), the court held that a memorandum of a sales contract, to satisfy the statute of frauds, need not describe the goods so exactly as to exclude the possibility that other goods would fall within the words of the writing since no more than reasonable certainty is necessary. The memorandum must completely evidence the contract by giving all the essential terms the parties agreed upon. Cobb v. Southern Plaswood Corporation, 171 F.Supp. 691 (W.D.Ark. 1959). On its face the written memorandum, consisting of the order and its acceptance (Exhibit 12), appears to contain all the terms generally considered necessary. The parties are identified; time for delivery is provided; the consideration is stated; the goods are described; and it is signed by the defendant's agent, the party to be charged. Only the following language raises certain doubts about the memorandum:

"This confirms order given to Mr. Cletus Wetli on this day and is subject to details covered in the discussion of the above equipment." (Exhibit 11)

■ It is not sufficient that a note or memorandum express the terms of a contract; it is essential that it completely evidence the contract therefrom; resort cannot be had to the terms of the oral contract to supply deficiencies in the memorandum. A contract in writing which leaves some essential term thereof to be shown by parol is only a parol contract and is, therefore, not enforceable under the statute of frauds. 49 Am.Jur., Statute of Frauds § 354 (1943); Cobb v. Southern Plaswood Corporation, 171 F. Supp. 691, 699 (W.D.Ark.1959).

■■ Although a contract, as evidenced in the memorandum, seems complete upon its face, if, in fact, there were additional terms, the memorandum is insufficient because the memorandum must state the essential terms of the oral contract. Thomas J. Baird Inv. Co. v. Harris, 209 F. 291 (8th Cir., 1913); Hooper v. First Exchange Nat. Bank of Coeur D'Alene, 53 F.2d 593 (9th Cir., 1931). Where, as here, the statute of frauds, rather than the parol evidence rule, is invoked, recovery may not be predicated upon parol proof of material terms omitted from the written memorandum. But an oral contract is not as such subject to the parol evidence rule. Parol evidence may, therefore, be used to show that the memorandum was incomplete and that the oral agreement contained terms not set forth in the memorandum. Nathan v. Spector, 281 App.Div. 451, 120 N.Y.S.2d 358 (1953); N. E. D. Holding Co., Inc. v. McKinley, 246 N.Y. 40, 157 N.E. 923 (1927).

Were there any material terms orally agreed upon which were not included in the memorandum as the defendant contends? The record reveals the following pertinent facts:

1. Two purchase orders were given. Both refer to oral discussions of details in the identical language.

2. The parties did in fact conduct oral discussions before the drafting of both orders.

3. The discussions preceding the giving of the first order involved the following details:

(a) Erving emphasized that it needed a rigid package. This detail was listed in the purchase orders given.

(b) The type of end seal which the package was to contain was definitely discussed:

Mr. Durna testified that one requirement was that no dog ears were to be on the package. (Tr. pp. 26–27)

Mr. Wetli stated that said discussion provided that the ends of the package be cut off and folded in. (Tr. p. 163) This substantiates Mr. Durna's testimony that dog ears were to be avoided. However, this may have been changed by Messrs. Campbell and Housen in their dis-

cussions which resulted in the second order. (Tr. pp. 181–182)

Mr. Slavin testified that the discussion mentioned in the order involved the requirements that the machine fit between Erving's converters, that it insert Erving's labels, and that it produce a rigid package. (Tr. pp. 199–201)

Mr. Wetli also testified that the machine was to apply Erving's labels. (Tr. p. 262)

Mr. Stompe testified that the discussions in question covered the following requirements: A snug package; no holes in the bag; placing labels in the bag; and proper closure of the bag. (Tr. p. 309)

Are any of the above-listed details essential terms which should have been enumerated in the memorandum? Regarding the machine fitting between Erving's paper converters, this was covered by the memorandum when it designated a 2W10 wrapper. This number refers to the size of the machine and its basic dimensions. (Tr. p. 286) The evidence that the machine handle plaintiff's labels is indefinite. There is other evidence indicating that the machine never was finally intended to handle such labels but that Erving contemplated hand insertion. (Tr. p. 312; Dep. Exhibit 29) In any event, the evidence is not sufficient to sustain a finding that this was an essential detail over which the parties reached agreement in the discussions referred to in the memorandum.

Relating to the sealing method to be used on the bag, it is clear from the evidence that this was discussed and that Erving was definitely concerned as to this characteristic. Mr. Durna testified:

"The specification which it did meet (referring to samples submitted by Hudson-Sharp) was that it shall have no ears." (Tr. p. 26)

The transcript is full of testimony that the closure of the package was one detail referred to in the discussions but it was not mentioned in the order. (Tr. pp. 163, 181–182, 199–201, 274–278, 309) It is obvious some agreement was reached concerning this detail during the discussion preceding the first order. Likewise, the discussions preceding the second order involved the type of end seal. As a result of said discussions, the parties agreed either that the seal would remain the same as previously agreed to, or that a change would be made. (Tr. pp. 241, 274–278) Erving was definitely concerned with the type of seal. Durna's testimony clearly illustrates this fact. Yet the memorandum makes no mention of this detail which was an essential detail in the eyes of the parties. Had Hudson-Sharp delivered a machine which would have produced a package which had dog ears, there is every reason to believe that Erving would have rejected such a machine as not complying with the contract. The parties had exchanged samples prior to the first order. The samples sent by Hudson-Sharp to Erving all contained a seal which had no dog ears. This is what Erving wanted as evidenced by the parol testimony, but the memorandum makes no mention of this requirement. It was an essential term.

The unfortunate result is that although the parties certainly knew what was intended in this regard, the terms were omitted from the memorandum of the contract. A mere reference in the memorandum to an oral bargain between the parties to the transaction will not justify proof of the terms of that bargain in order to satisfy the statute and to complete deficiencies in the writing. People's Outfitting Co. v. Wheeling Mattress Co., 67 Ind.App. 18, 118 N.E. 827 (1918); Swift & Co. v. Meehan, 283 Pa. 429, 129 A. 324 (1925). Therefore, it is the court's conclusion that the memorandum here failed to satisfy the statute of frauds. Thus, the contract is void under the statute.

Even though under the court's findings and conclusion the alleged contract is void because of failure to comply with the statute of frauds, it is the court's desire to make complete findings so that if this case is appealed and the court of appeals disagrees with the conclusion as

to the statute of frauds, it can direct the entry of judgment and avoid a retrial.

The court feels that the question of burden of proof as to the statute of frauds is a close one. The statute of frauds is an affirmative defense under the Federal Rules of Civil Procedure. It was not raised in the original answer or at the pretrial conference. It came in very late by amendment. Under the Federal Rules, it must be affirmatively pleaded.

It would be more logical, in the court's opinion, to place the burden on the defendant to establish that the contract was void for noncompliance with the statute. If the burden were on the defendant, the court would find that the defendant has not met that burden by failing to establish by a preponderance of the evidence that the statute was not complied with.

The court's findings of fact and conclusions of law are as set forth in the foregoing decision in accordance with the requirements of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The clerk is hereby directed to enter an order for judgment dismissing the action and for defendant's costs herein.

## On Motion for New Trial

Following the decision of this court on September 26, 1963, plaintiff moved for a new trial under Rule 59 of the Federal Rules of Civil Procedure, and that the court reconsider, vacate, and amend certain of its findings, conclusions, and its direction for judgment.

Erving Paper Mills (hereinafter referred to as "Erving") contends that in fact the memorandum of sale does contain language which required the defendant to manufacture a machine which would eliminate "dog ears." This conclusion is urged because the memorandum specified a Model "#2W10" Campbell Wrapper, and the record clearly reveals that all Campbell Wrappers contained a change mechanism which allowed the machine to produce a package that either contained dog ears or eliminated them by gusseting the ends. Thus, the machine designated was not only able to do what Erving wanted it to do but could do more. This conclusion is supported by the testimony of Mr. Wetli and is not controverted. The purchase of a Model #2W10 Campbell Wrapper, even though specially adapted to plaintiff's requirements, would be capable of making gusseted seals. Therefore, it would appear that the finding that the memorandum made no mention of the end seal requirement was in error. By using the designation "#2W10" the parties in fact did cover the essential detail of the end seal. Since only a minor adjustment was involved in alternating between a gusseted seal and straight seal, it is the court's finding on reconsideration that the memorandum sufficiently covered the area.

On reconsideration the court further finds that the words "efficiently polyethelene wrap" as used in the memorandum are too uncertain. There is authority for the proposition that a court may properly examine what the parties in fact meant when they use certain language to describe the thing contracted for. Corbin on Contracts in Volume 2, Section 499, supports this premise—that parol testimony is proper where the statute of frauds applies under certain circumstances:

> " * * * that the courts do not in fact bind themselves by excluding parol testimony when it is a necessary aid to understanding * * *."

Likewise, consider the following language which concerns itself with whether a memorandum sufficiently described the property where it failed to state the city in which the realty was located:

> " * * * 'If the designation is so definite that the purchaser knows exactly what he is buying, and the seller knows what he is selling, and the land is so described that the court can, with the aid of extrinsic evidence, apply the description to the exact property intended to be sold, it is enough. * * *' 29 Am. & Eng. Encycl. of L. 866." Hampe v. Sage, 82 Kan. 728, 109 P. 406, 408 (1910).

Many other courts have held that parol evidence is proper to explain latent ambiguities. Stindt v. Stetson, 272 F. 770 3d Cir. 1921), reversed on other grounds 279 F. 209 (3d Cir., 1922); Howel v. Kinney, 26 Ga.App. 168, 105 S.E. 716 (1921); Wertheimer v. Klinger Mills, Inc., 216 Ind. 481, 25 N.E.2d 246, 129 A.L.R. 1226 (1940). Likewise, parol evidence has been held admissible for applying the description in the memorandum and thus identifying the subject matter of the contract where it may be determined with certainty. Lehman v. Pierce, 109 Ind.App. 497, 36 N.E.2d 952, 956 (1941); Marks v. Cowdin, 226 N.Y. 138, 123 N.E. 139 (1919).

■ In Wisconsin, before parol evidence can be used to make reasonably certain an indefinite description of property for purposes of satisfying the statute of frauds, the description in the memorandum must furnish some foundation, link, or key to the oral or extrinsic testimony which identifies the property. Thiel v. Jahns, 252 Wis. 27, 30 N.W.2d 189 (1947); Kelly v. Sullivan, 252 Wis. 52, 30 N.W.2d 209 (1947). The foregoing cases involve the sufficiency of the description of realty and thus interpret a different statute. However, the same rule would logically have application to the description of personal property under a contract with the statute of frauds relating to personal property.

■ Here parol evidence could show speed, waste, or end result, or any number of elements may have been meant by the terms of the memorandum when it used the words "efficiently polyethelene wrap." To establish the description of the machine intended to be sold, it would be necessary to give independent effect to the parol understanding as to the meaning of the term. This would result not in mere identification but the supplying of a portion of the description by parol.

"* * * It is not what the parties to the contract know but what they put in the contract as the description, that is the test. All the terms of an oral agreement may be definite but the contract is void unless it or a memorandum meets the call of the statute. The indefiniteness of a description for the purpose of the statute of frauds *is not to be treated as an ambiguity in the contract and resolved by principles applicable to ambiguities of valid contracts.* The test of materiality of evidence in such cases rests on different and broader principles. Not much would be left of the statute of frauds if all parol evidence were probative to make certain the uncertainties of a memorandum." (Emphasis added.) Stuesser v. Ebel, 19 Wis.2d 591, 596, 120 N.W. 2d 679, 682 (1963).

Plaintiff's attempt to explain the meaning of "efficiently polyethelene wrap" by referral to parol evidence must fail.

Plaintiff would also have this court change the law as to burden of proof. The argument posed is unique and has *some logic, but this court is obliged to apply the Wisconsin law as it presently exists.*

Erving has failed to add anything to substantiate its contention that it did in fact meet its burden in proving that the machines would not have been suitable for sale to others had they been built. The fact that defendant's general manager testified that it had been unable to build a practical machine at the time is irrelevant as to plaintiff's contention that it has sustained its burden. The issue is: If Hudson-Sharp Machine Co. had been able to build a practical machine, would it then have been marketable? On this issue, plaintiff has failed to meet its burden. In its decision, this court found that "The record is not at all clear that such would not have been resalable in the ordinary course of trade." Plaintiff has cited nothing which refutes this finding.

The court's decision and findings of September 26, 1963, are hereby amended as set forth in this decision; in all other respects they are unchanged.