ERVING PAPER MILLS, a Massa-
chusetts corporation, Plaintiff-
Appellant,

v.

HUDSON-SHARP MACHINE CO., a Wis-
consin corporation, Defendant-
Appellee.

No. 14530.

United States Court of Appeals
Seventh Circuit.

June 3, 1964.

Rehearing Denied July 1, 1964.

Rehearing Denied July 1, 1964.
(en banc).

James L. Everson, E. L. Everson, John
C. Whitney, Everson, Whitney, O'Melia,
Everson & Brehm, Green Bay, Wis., for
plaintiff-appellant.

Maxwell H. Herriott, James C. Mallien,
Quarles, Herriott & Clemons, Milwau-
kee, Wis., for defendant-appellee.

Before HASTINGS, Chief Judge, and
DUFFY and SCHNACKENBERG, Cir-
cuit Judges.

HASTINGS, Chief Judge.

Plaintiff Erving Paper Mills (Erving),
a Massachusetts corporation, brought
this diversity action against defendant
Hudson-Sharp Machine Co. (Hudson-
Sharp), a Wisconsin corporation, seeking
$300,000 in damages for breach of con-
tract.

The district court entered judgment
dismissing the action, with costs to Hud-
son-Sharp, due to failure of the contract
to comply with the statute of frauds.
The district court's opinion is reported
at 223 F.Supp. 913 (1963). Erving ap-
pealed.

Erving operates a paper mill and man-
ufactures and sells paper napkins. Prior

to 1956, Erving generally marketed napkins in cardboard packages. About 1956, Erving began marketing its product in re-usable polyethylene bags. The napkins were placed in these bags and sealed by hand.

By July, 1956, the demand for these napkins in re-usable bags had increased to the point where Erving was interested in investigating the use of machines for packaging.

In July, 1956, Erving was contacted by Cletus Wetli, vice-president of Hudson-Sharp. Hudson-Sharp was engaged in designing, manufacturing and selling various types of machinery, including a wrapping machine known as the Campbell Wrapper.

Wetli familiarized himself with Erving's packaging needs and on July 17, 1956 wrote Erving, in pertinent part, as follows:

"Under separate cover I am sending you two packages of napkins wrapped in polyethylene in a manner that we can accomplish on a standard Campbell wrapper.

"This machine will operate at any speed between 20 and 60 packages per minute. The machine is illustrated on the enclosed photograph #832.

"The price of the machine, complete, f. o. b. Green Bay, Wisconsin is $13,150.00.

"These sample packages are not just as tightly wrapped as I wanted them but you understand that we can make it tighter on the machine.

"After you have received these samples, I would appreciate your comments."

Following this letter, there were numerous communications and negotiations between Erving and Hudson-Sharp and on August 20, 1956 Erving placed a purchase order with Wetli for two Campbell Wrappers. Wetli transmitted the order to Hudson-Sharp with the following memorandum, in part:

"Attached is a purchase order for 2 machines at $13,150.00 each, P.O. #11198.

"The purchase order is explanatory in itself so I am not going to go into further details at this time except to caution that the package must be very tight with a short end as possible. You have received samples of their requirements and before proceeding with the machine actually, I would rewrap these samples and return them to Erving for them to give us a definite confirmation as to their satisfaction.

"As discussed with Mr. Campbell over the phone, we are sure that we can sufficiently compress these napkins in polyethylene and make the longitudinal seal, then using a short crimp on the ends, the bulk of the napkins would come back and produce a sufficiently tight package."

As a result of negotiations two or three days after August 20, 1956, the purchase price was reducd to $11,000 per machine and a new purchase order was written. This purchase order was identical to the first except for reduction in price and immaterial grammatical corrections. It stated:

"Model #2W10 Campbell Wrappers

"Each wrapper to efficiently polyethylene wrap ¼ fold, 13½", luncheon napkins, both 160 ct. & 250 ct. package sizes as samples to be submitted by Hudson Sharp and to be approved by Erving Paper Mills.

"Each wrapper to be equipped with change parts required for both size packages.

"Wrapped packages will be such that package can be held in one hand at the end in a horizontal position and the package will remain a rigid block.

"This machine is to wrap at the rate of 40 packages per minute and is to be equipped with infeed and delivery conveyors to handle this production.

"IMPORTANT: It is agreed that the manufacture of the second machine is to be held up until the first machine is in satisfactory operation at Erving Paper Mills and a decision is reached as to what product is then to be wrapped on this second machine.

"Delivery is to be within 60 days of receipt of this order.

"This confirms order given to Mr. Cletus Wetli on this day and is subject to details covered in the discussion of the above equipment.

$11,000.00 per machine

ERVING PAPER MILLS,

By [Signature of Meyer Hyman, Treasurer of Erving]"

On August 29, 1956, Erving received a letter from Hudson-Sharp which said, *inter alia*:

"We have for acknowledgment your P.O. #11319 dated August 20, 1956, covering two No. 2W10 Campbell Wrappers especially constructed for wrapping 160 and 250 count luncheon napkins in polyethylene, per samples submitted.

"It is understood that these machines will be constructed on the basis as set out in your order, with one machine to be manufactured and installed first before building the second machine.

"Thank you very much for the order, and we have entered these in our production schedule accordingly."

On October 19, 1956, Erving received from Hudson-Sharp the following letter, in part:

"We are very sorry to have to inform you that our Engineering Department has not been able to design a machine that we feel will do the job you want. We have done considerable conception design thinking and have given due consideration to Mr. Durna's suggestion for using a Doughboy Sealer to seal one end. There seems to be so many problems involved, however, that we do not feel a practical design will result.

"We regret very much, therefore, that we cannot firm your order and have no choice but to request cancellation. We sincerely hope that you have not been inconvenienced and would appreciate your confirming this letter.

"We may do additional development work on a package of this type; if we feel that we have solved our major problems, we will again get in touch with you promptly."

This letter was the first indication to Erving that Hudson-Sharp intended to cancel the order. Erving answered with a letter which said, in substance, that Erving had completed conversion plans in anticipation of the machines and could not accept cancellation.

Further negotiations failed and Erving brought this action for breach of contract. By stipulation of the parties, the issue of damages was severed from that of liability and this appeal is concerned only with the latter.

Hudson-Sharp, in its answer to Erving's complaint, asserted that it had not accepted Erving's order; that Erving's offer was subject to a condition precedent which did not occur; and the contract did not satisfy the Wisconsin statute of frauds.

The district court held in favor of Erving on the first two defenses and for Hudson-Sharp on the third.

While Hudson-Sharp did not file a cross-appeal challenging the district court's holdings that the acknowledgment received by Erving on August 29, 1956, supra, constituted an acceptance, and that the asserted condition precedent was satisfied or waived, we express our agreement with these holdings and adopt them as part of this opinion. 223 F. Supp. at 916–920.

The issue before us is whether the contract came within the Wisconsin statute of frauds and, if so, whether there was compliance with the statute.

We are concerned with Section 121.04 of the Wisconsin Statutes (1955) which provides in part as follows:

"121.04 Statute of frauds. (1) A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf.

"(2) The provisions of this section apply to every such contract or sale, notwithstanding that the goods may be intended to be delivered at some future time or may not at the time of such contract or sale be actually made, procured, or provided, or fit or ready for delivery, or some act may be requisite for the making or completing thereof, or rendering the same fit for delivery; *but if the goods are to be manufactured by the seller especially for the buyer, and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section shall not apply.*" (Emphasis added.)

██ Upon which party the burden of proof rests has been held to be a matter of substantive law and governed by local law in diversity cases. Palmer v. Hoffman, 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

The district court held, 223 F.Supp. at 921, that under Wisconsin law, Libman v. Fox Pioneer Scrap Iron Co., 175 Wis. 485, 185 N.W. 551 (1921); Bacon v. Eccles, Jr., 43 Wis. 227 (1877), Erving had the burden of proving that the statute of frauds had been complied with or of showing facts which would take the case out of the statute and that Erving had not sustained this burden.

Erving concedes that the general rule in Wisconsin is that the burden of proof of compliance with the statute of frauds is on the party claiming the contract to be valid. However, Erving contends that the burden of proving whether the specially manufactured goods were salable in the ordinary course of the manufacturer's business should constitute an exception to this general rule and that this burden should be on the manufacturer.

We are unaware of any Wisconsin case which has passed upon this question and, therefore, we must look to the underlying policies involved and the law in other jurisdictions in an attempt to determine how Wisconsin courts would decide this issue.

The machine contracted for in the instant case was never built. Arthur Olson, general manager at Hudson-Sharp for food machinery, testified concerning the reasons for not constructing the machine. He stated:

"I made the final decision not to go ahead with the Campbell wrapping machines for Erving. As to what led to my decision, one of the first problems that confronted me when I came to Hudson-Sharp was that we had approximately $140,000 worth of Campbell wrappers which were either on their way back to us or had already been shipped back to us as unacceptable by about ten different customers. As to other reasons which led to the decision not to go ahead, we were concerned about the fact that the machine would not do the job, generally that Erving wanted done."

On cross-examination, Olson testified that the reason the machine was not built was because construction would be "very difficult."

We feel that it is placing an unfair and unrealistic burden on Erving to require it to prove the unsalability of this machine. Erving does not manufacture and sell machines of this type and the particular machine in issue has not been built due to difficulties encountered in

construction. Further, we cannot understand how a customer can be charged with the burden of proving the unsalability of a product the supplier is unable to produce.

IX Wigmore, Evidence § 2486, at 275 (3d ed. 1940), in concluding a discussion of various rules used to determine which party has the burden of proof states, "The truth is that there is not and cannot be any one general solvent for all cases. It is merely a question of policy and fairness based on experience in the different situations."

■ One policy consideration discussed by Wigmore and applied in certain cases, which we feel applicable to the present case, is that "the burden of proving a fact is said to be put on the *party who presumably has peculiar means of knowledge* enabling him to prove its falsity if it is false." Ibid.

Hudson-Sharp was in the business of manufacturing and selling wrapping machines. It would have peculiar knowledge, unavailable to Erving, of whether, in the language of the statute, the machine was "not suitable for sale to others in the ordinary course of the seller's [Hudson-Sharp] business."

We hold, under the circumstances of this case, a rule of fairness places the burden of proving the salability of a machine which the manufacturer deems too difficult to manufacture, on the manufacturer. See Eddleman v. Myers, 98 Ind.App. 394, 188 N.E. 802 (1934).

We must determine whether Hudson-Sharp sustained this burden.

Hudson-Sharp manufactured standard size Campbell wrapping machines. The district court stated:

"It is obvious that * * * [Hudson-Sharp] did not have a machine which would accomplish * * * [Erving's] needs. Thus, it fully intended to take an existing machine, use it as a base, and build it into a machine to perform * * * [Erving's] specialized requirements. The desired machine was not then a standard item which Hudson-Sharp

kept in stock. The machine that did exist was ill-suited for the job. * * * [Hudson-Sharp] was to take the machine it did have, consisting of a frame, motor, differential, and certain other parts, and build it into a unit which would perform * * * [Erving's] own needs." 223 F.Supp. at 922.

■ If merely slight alterations in a machine make it suitable for sale to others, the statute of frauds has been held applicable. Clinton Mills Co. v. Saco-Lowell Shops, 1 Cir., 3 F.2d 410 (1925). If substantial changes in a manufacturer's standard machine are required, cases have held that the statute of frauds is inapplicable. Ericsson Mfg. Co. v. Caille Bros. Co., 195 Mich. 545, 162 N.W. 81 (1917).

■ In the instant case the district court found:

"* * * There is little in the record to indicate that a substantial overhaul would have been necessary to make the machines marketable beyond what might possibly be inferred from the nature of their special construction. Likewise, there is absolutely nothing to indicate that only a 'routine' adjustment would have been necessary as alleged by * * * [Hudson-Sharp's] counsel." 223 F.Supp. at 923.

"* * * If the burden were on the defendant, the court would find that the defendant has not met that burden * * *." Id. at 926.

This finding is supported by substantial evidence. We adopt the portion of the district court's opinion which sets out this evidence. 223 F.Supp. at 922, 923.

■ In view of our holding, supra, and this finding, we conclude that Hudson-Sharp failed to sustain its burden of proving the machine to be suitable for sale to others in the ordinary course of its business and that the Wisconsin statute of frauds does not apply to this sale.

It necessarily follows that we do not reach the question of whether the writ-

ings between the parties constituted a memorandum of the contract sufficient to satisfy the statute of frauds.

The judgment below is reversed and the case is remanded to the district court with instructions to enter judgment for Erving on the question of liability.

Reversed and remanded.