# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 04-2551

CHICAGO PRIME PACKERS, INC.,

*Plaintiff-Appellee,*

v.

NORTHAM FOOD TRADING CO.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 4447—**Geraldine Soat Brown**, *Magistrate Judge.*

_____

ARGUED JANUARY 4, 2005—DECIDED MAY 23, 2005

_____

Before FLAUM, *Chief Judge*, and EVANS and WILLIAMS,
*Circuit Judges*.

FLAUM, *Chief Judge*. Defendant-appellant Northam Food
Trading Company ("Northam") contracted with plaintiff-
appellee Chicago Prime Packers, Inc. ("Chicago Prime") for
the purchase of 40,500 pounds of pork back ribs. Following
delivery, Northam refused to pay Chicago Prime the con-
tract price, claiming that the ribs arrived in an "off condi-
tion." Chicago Prime filed this diversity action for breach of
contract against Northam. Following a bench trial, the
district court awarded Chicago Prime $178,200.00, the

contract price, plus prejudgment interest of $27,242.63. Northam appeals the award. For the reasons stated herein, we affirm.

## I. Background

The district court found the following facts based on the stipulations of the parties and the evidence presented at trial. Because neither party contends that any of the findings of fact in this section are "clearly erroneous," we accept them as established for purposes of this appeal. *See* Fed. R. Civ. P. 52(a).

Chicago Prime, a Colorado corporation, and Northam, a partnership formed under the laws of Ontario, Canada, are both wholesalers of meat products. On March 30, 2001, Chicago Prime contracted to sell Northam 1,350 boxes (40,500 pounds) of pork back ribs. Northam agreed to pay $178,200.00 for the ribs, with payment due within seven days of receipt of the shipment. The contract also set forth a description of the ribs, the price, and the date and location for pick-up.

Chicago Prime purchased the ribs specified in the contract from meat processor Brookfield Farms ("Brookfield"). When a pork loin is processed at Brookfield, it is broken into various segments, one of which is the back rib. After processing, Brookfield packages back ribs "flat" (horizontally), layer by layer, in 30-pound boxes. The ribs are placed first in a blast freezer and then transferred to an outside freezer where they remain until shipped.

In addition to its own freezers, Brookfield stored the ribs at issue in this case in as many as two independent cold storage facilities: B&B Pullman Cold Storage ("B&B"), and Fulton Market Cold Storage ("Fulton"). According to Brookfield's temperature logs and quality control records for its own facilities, the ribs were maintained at acceptable

temperatures and were processed and maintained in accordance with Brookfield's procedures. Records presented at trial also indicate that the ribs were stored at or below acceptable temperatures during the entire time they were in B&B's possession. The parties offered no evidence regarding storage of the ribs at Fulton.

On April 24, 2001, Brown Brother's Trucking Company ("Brown"), acting on behalf of Northam, picked up 40,500 pounds of ribs from B&B. Chicago Prime, the seller, never possessed the ribs. When Brown accepted the shipment, it signed a bill of lading, thereby acknowledging that the goods were "in apparent good order." The bill of lading also indicated, however, that the "contents and condition of contents of packages [were] unknown." The next day, Brown delivered the shipment to Northam's customer, Beacon Premium Meats ("Beacon"). Like Chicago Prime, Northam, the buyer, never possessed the ribs. Upon delivery, Beacon signed a second bill of lading acknowledging that it had received the shipment "in apparent good order," except for some problems not at issue in this case.

Under the terms of the contract, Northam was obligated to pay Chicago Prime by May 1, 2001. Sandra Burdon, who negotiated the contract on behalf of Northam, testified that, on that date, Northam had no basis for withholding payment. In fact, she thought that a check had been sent to Chicago Prime prior to May 1, 2001, but subsequently discovered that the check had not been mailed. On May 2, 2001, Chicago Prime, not having heard from Northam, demanded payment.

On May 4, 2001, Beacon began "processing" a shipment of ribs and noticed that the product appeared to be in an "off condition." Beacon asked Inspector Ken Ward of the United States Department of Agriculture ("USDA") to examine the product. Ward inspected the ribs at the Beacon facility, found that the meat "did not look good," and ordered Beacon

to stop processing it. Ward then placed a "U.S. Retained" tag on the shipment, noting "yellow, green, temp[erature], abused, spoiled," and had the ribs placed in Beacon's freezer. The same day, Northam and Chicago Prime learned of a potential problem with the ribs.

Inspector Ward returned to Beacon on May 7 and 8, 2001 and examined both frozen and thawed samples of the product. On May 23, 2001, Dr. John Maltby, Ward's supervisor, also conducted an on-site inspection of the ribs. When Dr. Maltby arrived, Beacon employees were "reworking" the ribs, trying to salvage any good portions. Dr. Maltby reviewed Beacon's shipping records and temperature logs from the relevant time period and found no "anomalies" or "gaps." In addition, he examined approximately 20 cases of ribs and prepared a written report. According to this report, Beacon gave Dr. Maltby two pallets of frozen ribs untouched by Beacon, as well as some of the product that Beacon had reworked. Looking inside the intact pallets, Dr. Maltby found ribs stacked both horizontally and vertically, with some frozen individually and others frozen together in larger units. The individually frozen ribs were "putrid," while the ribs frozen in larger units were "good."

Examining samples of the thawed, reworked product, Dr. Maltby found putrid, green, slimy ribs, but no sign of temperature abuse. He concluded in his report that the inspected product was rotten, that it arrived at Beacon in a rotten condition, and that it appeared to have been "assembled from various sources." Dr. Maltby also concluded that there was no opportunity for salvage and that all of the product should be condemned. The same day, the USDA issued a Notice of Receipt of Adulterated or Misbranded Product and the entire shipment of 1,350 boxes of ribs was condemned. After Northam informed it of the results of Dr. Malby's inspection, Chicago Prime continued to demand payment and eventually filed suit.

At trial, it was undisputed that the parties entered into a valid and enforceable contract for the sale and purchase of ribs, that Chicago Prime transferred a shipment of ribs to a trucking company hired by Northam, and that Northam had not paid Chicago Prime for the ribs. Northam argued that it was relieved of its contractual payment obligation because the ribs were spoiled when its agent, Brown, received them. The district court concluded that it was Northam's burden to prove nonconformity, and held that Northam had failed to prove that the ribs from Chicago Prime were spoiled at the time of transfer to Brown. The court went on to state alternative holdings in favor of Chicago Prime based on its finding that, "even if the ribs were spoiled at the time of transfer, Northam . . . failed to prove that it examined the ribs, or caused them to be examined, within as short a period as is practicable under the circumstances, or that it rejected or revoked its acceptance of the ribs within a reasonable time after it discovered or should have discovered the alleged non-conformity." *Chi. Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F. Supp. 2d 702, 711 (N.D. Ill. 2004). The court awarded Chicago Prime the contract price of $178,200.00, plus prejudgment interest of $27,242.63.

## II.  Discussion

The district court held, and the parties do not dispute, that the contract at issue is governed by the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), *reprinted at* 15 U.S.C.A. Appendix (West 1997), a self-executing agreement between the United States and other signatories, including Canada. Under the CISG, "[t]he seller must deliver goods which are of the quantity, quality and description required by the contract," and "the goods do not conform with the contract unless they . . . [a]re fit for the purposes for which goods of the same description would

ordinarily be used." CISG Art. 35(1)-(2). The risk of loss passes from the seller to the buyer when the goods are transferred to the buyer's carrier. CISG Art. 67(1). While the seller is liable "for any lack of conformity which exists at the time when risk passes to the buyer," CISG Art. 36(1), the buyer bears the risk of "[l]oss of or damage to the goods after the risk has passed to the buyer . . . unless the damage is due to an act or omission of the seller." CISG Art. 66. In other words, Chicago Prime is responsible for the loss if the ribs were spoiled (nonconforming) at the time Northam's agent, Brown, received them from Chicago Prime's agent, Brookfield, while Northam is responsible if they did not become spoiled until after the transfer.

The parties agree that the main factual issue before the district court was whether the ribs were spoiled at the time of transfer. On appeal, Northam makes two arguments: (1) that the district court erred in placing upon Northam the burden of proving that the ribs were spoiled at the time of transfer, and (2) that the evidence presented at trial does not support the district court's finding that the ribs became spoiled after Brown received them from Brookfield.

## A. Burden of Proof

Northam asserts that Chicago Prime should bear the burden of proving that the ribs were not spoiled at the time of transfer because the quality of the goods is an essential element of Chicago Prime's breach of contract claim. Chicago Prime counters that nonconformity is an affirmative defense for which Northam, as the defendant-buyer, has the burden of proof. Proper assignment of the burden of proof is a question of law that we review de novo. *Estate of Kanter v. Comm'r of Internal Revenue*, 337 F.3d 833, 851 (7th Cir. 2003), *rev'd on other grounds, Ballard v. Comm'r of Internal Revenue*, 125 S. Ct. 1270 (Mar. 7, 2005).

The CISG does not state expressly whether the seller or buyer bears the burden of proof as to the product's conformity with the contract. Because there is little case law under the CISG, we interpret its provisions by looking to its language and to "the general principles" upon which it is based. *See* CISG Art. 7(2); *see also Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1027-28 (2d Cir. 1995). The CISG is the international analogue to Article 2 of the Uniform Commercial Code ("UCC"). Many provisions of the UCC and the CISG are the same or similar, and "[c]aselaw interpreting analogous provisions of Article 2 of the [UCC], may . . . inform a court where the language of the relevant CISG provision tracks that of the UCC." *Delchi Carrier SpA*, 71 F.3d at 1028. "However, UCC caselaw 'is not *per se* applicable.'" *Id.* (quoting *Orbisphere Corp. v. United States*, 726 F. Supp. 1344, 1355 (Ct. Int'l Trade 1989)).

A comparison with the UCC reveals that the buyer bears the burden of proving nonconformity under the CISG. Under the UCC, the buyer may plead breach of the implied warranty of fitness for ordinary purpose as an affirmative defense to a contract action by the seller for the purchase price. *See Comark Merch., Inc. v. Highland Group, Inc.*, 932 F.2d 1196, 1203 (7th Cir. 1991); *Alberts Bonnie Brae, Inc. v. Ferral*, 544 N.E.2d 422, 423 (Ill. App. 1989); *see also* 77A CORPUS JURIS SECUNDUM SALES § 287 (2004) ("[T]he buyer, when sued for the purchase price, may set up a breach of warranty as a defense to the seller's action."). In such an action it is the defendant-buyer's burden to prove the breach of the warranty. *See Comark Merch.*, 932 F.2d at 1203; *Alberts Bonnie Brae*, 544 N.E.2d at 424-25.

Section 2-314 of the UCC provides that a warranty that goods are "fit for the ordinary purpose for which such goods are used" is implied unless the contract states otherwise. Mirroring the structure and content of this section, Article 35(2) of the CISG provides that unless the contract states otherwise, "goods do not conform with the contract

unless they . . . [a]re fit for the purposes for which goods of the same description would ordinarily be used." *See* RALPH H. FOLSOM, 1 INTERNATIONAL BUSINESS TRANSACTIONS § 1.15, at 39 (2d ed. 2002) (the CISG's approach "produces results which are comparable to the 'warranty' structure of the UCC."). Accordingly, just as a buyer-defendant bears the burden of proving breach of the implied warranty of fitness for ordinary purpose under the UCC, under the CISG, the buyer-defendant bears the burden of proving nonconformity at the time of transfer. *See* Larry A. DiMatteo et al., *The Interpretive Turn in International Sales Law: An Analysis of Fifteen Years of CISG Jurisprudence*, 24 NW. J. INT'L L. & BUS. 299, 400 (2004) (Under the CISG, "[t]he buyer is allocated the burden of proving that the goods were defective prior to the expiration of the seller's obligation point."); *see also* FOLSOM, 1 INTERNATIONAL BUSINESS TRANSACTIONS § 1.15, at 41. The district court was correct to conclude that Northam bears the burden of proving that the ribs were spoiled at the time of transfer.

### B.  Conformity of the Ribs at the Time of Transfer

   The district court held that Northam failed to prove that the ribs were spoiled, or nonconforming, at the time of transfer. First, the court found that other evidence undermined Dr. Maltby's testimony that the ribs were rotten when they arrived at Beacon:

   Chicago Prime points out several problems with Northam's reliance on Dr. Maltby's conclusion. Most significantly, neither Dr. Maltby nor anyone else could confirm that the meat Dr. Maltby inspected was in fact the product that was sold to Northam by Chicago Prime, and evidence was produced at trial to suggest that they were not the same ribs. Even though the rib boxes were labeled with Brookfield establishment numbers, the evidence showed that Beacon had purchased and received

other loads of ribs originating from Brookfield prior to April 25, 2001. Furthermore, some of the ribs examined by Dr. Maltby (from one of the Intact Pallets) were stacked both horizontally and vertically. Brookfield packages its loin back ribs only horizontally. Dr. Maltby had no personal knowledge of how or where the meat was stored from April 25, 2001 to May 23, 2001, and the first time any government inspector viewed the meat was on May 4, 2001. According to Dr. Maltby, loin back ribs, if kept at room temperature, could spoil in five to seven days. Surprisingly, Northam did not present any witness affiliated with Beacon to address those issues.

*Chi. Prime Packers*, 320 F. Supp. 2d at 710 (citations omitted). Next, the district court found that three witnesses had credibly testified that "the ribs delivered by Brookfield were processed and stored in acceptable conditions and temperatures from the time they were processed until they were transferred to Northam on April 24, 2001." *Id.* Despite Northam's attempts to discredit the testimony of these witnesses by pointing to deficiencies in Brookfield's record-keeping during the relevant period, the district court found "nothing in the evidence demonstrating that Brookfield, B&B or Fulton did anything improper with respect to the ribs or that the ribs were spoiled prior to being transferred to Northam." *Id.* Based on these factual findings, the district court concluded that Northam had not met its burden of demonstrating that the ribs were spoiled at the time of transfer. *Id.* at 711.

By highlighting Dr. Maltby's testimony and potential gaps in Chicago Prime's evidence, Northam suggests that the opposite holding is also supportable. This, however, is not the correct inquiry. On appeal from a bench trial, we will not set aside the factual conclusions of the district court "unless clearly erroneous." Fed. R. Civ. P. 52(a). "Under this standard, one who contends that a finding is clearly erroneous has an exceptionally heavy burden to carry on

appeal." *Spurgin-Dienst v. United States*, 359 F.3d 451, 453 (7th Cir. 2004). This is especially true when the appellant argues that the district court erred in crediting or discrediting a witness's testimony. *See id.*

Northam argues that the district court erred in discrediting Dr. Maltby's testimony, and contends that Dr. Maltby's conclusion that the ribs were rotten before the transfer should be determinative. Even if the district court *could* have given Dr. Maltby's conclusion more weight, however, Northam has not shown that the court clearly erred in finding the evidence undermining his conclusion to be more persuasive.

The evidence supporting Northam's position was not so overwhelming that it was clear error to find in favor of Chicago Prime. Northam offered no credited evidence showing that the ribs were spoiled at the time of transfer or excluding the possibility that the ribs became spoiled after the transfer. In addition, it presented no evidence that Brookfield stored the ribs in unacceptable conditions that could have caused them to become spoiled before the transfer. Finally, Northam did not present a witness from Beacon to respond to the evidence suggesting that the ribs examined by Dr. Maltby were not those sold to Northam by Chicago Prime. Upon this record, the district court did not clearly err in finding that Northam did not meet its burden of proof as to its affirmative defense of nonconformity.

Because we hold that the district court correctly assigned to Northam the burden of proving nonconformity and did not clearly err in finding that Northam had not met this burden, we need not reach the district court's alternative holdings.

### III. Conclusion

We AFFIRM the district court's award to Chicago Prime.

A true Copy:

    Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*